1   WO

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                       FOR THE DISTRICT OF ARIZONA

7

8   United States of America,        )
                                      )
9             Plaintiff,              )
                                      )
10            v.                      )        3:13 MJ 4039 PCT MEA
                                      )
11  Julian Ismael Loera,             )        MEMORANDUM AND ORDER
                                      )
12            Defendant.             )
    _____ )

13

14          Before the Court is Defendant's motion (Doc. 10) to

15  dismiss the charge against him, alleging an assault by striking,

16  beating or wounding, in violation of 18 U.S.C. § 113(a)(4) and

17  18 U.S.C. § 1152, a Class B misdemeanor also referred to as a

18  petty offense.[1]

19          Defendant's motion and the government's response raise

20  matters for the Court's consideration which other courts have

21  left for another day.  See Means v. Navajo Nation, 432 F.3d 924,

22  934-35 (9th Cir. 2005).  The resolution of the issues requires

23  the Court to journey into the world of "Indian Law" which has

24  been described as a "complex patchwork of federal, state and

25  tribal law, which is better explained by history than by logic."

26

27  _____

28          [1] On the date the pending charge against Defendant was filed, a
    violation of 18 U.S.C. § 113(a)(4) was a Class B misdemeanor. Pursuant
    to recent changes in the Violence Against Women Reauthorization Act
    of 2013 ("VAWA"), Pub. L. No. 113-4, which are not applicable to
    Defendant, it is now a Class A misdemeanor.

United States v. Bruce, 394 F.3d 1215, 1218 (9th Cir. 2005) (internal quotations omitted).  Indian law has also been described as "schizophrenic": "Federal Indian policy is, to say the least, schizophrenic.  And the confusion continues to inform federal Indian law..."  United States v. Lara, 541 U.S. 193, 219, 124 S. Ct. 1628, 1644-45 (2004) (Thomas, J., concurring).

The issues raised in this matter are:

1. After considering the factors found in Bruce, is Defendant an "Indian" as that term is used in 18 U.S.C. § 1152?

2. As a matter of law, assuming Defendant is an Indian and because he is not charged with a crime found in the Major Crimes Act (18 U.S.C. § 1153), to what type of Indian does 18 U.S.C. § 1152 convey immunity from federal prosecution?

**Procedural History**

A criminal complaint docketed in the United States District Court for the District of Arizona on February 8, 2013, alleges that on February 2, 2013, on the Fort Mojave Indian Reservation, in the District of Arizona, Defendant, alleged by the government to be a "non-Indian", knowingly and recklessly assaulted a female Indian, i.e., an enrolled member of the Fort Mojave Indian Tribe.  The complaint charges Defendant committed an assault by striking, beating or wounding, in violation of 18 U.S.C. § 113(a)(4) and 18 U.S.C. § 1152.  Section 1152, also known as the "General Crimes Act," authorizes federal jurisdiction over certain crimes committed by non-Indians against Indians in Indian country.

Section 1152 provides:

Except as otherwise expressly provided by

law, the general laws of the United States as
to the punishment of offenses committed in
any place within the sole and exclusive
jurisdiction of the United States, except the
District of Columbia, shall extend to the
Indian country.
    This section shall not extend to offenses
committed by one Indian against the person or
property of another Indian, nor to any Indian
committing any offense in the Indian country
who has been punished by the local law of the
tribe, or to any case where, by treaty
stipulations, the exclusive jurisdiction over
such offenses is or may be secured to the
Indian tribes respectively.

On March 6, 2013, Defendant filed a motion to dismiss the charge, arguing the Court does not have jurisdiction to prosecute him pursuant to section 1152 because he is an "Indian" and the statute precludes federal jurisdiction over Indian-on-Indian crimes in Indian country.  At the parties' request the Court held an evidentiary hearing with regard to the issue on April 19, 2013, and March 8, 2013.  The parties were ordered to and did submit proposed findings of fact and conclusions of law on June 14, 2013.  See Doc. 26 & Doc. 27.   For the reasons that follow, Defendant's motion to dismiss the charge against him is **denied**.

**Governing Law**

Federal Rule of Criminal Procedure 12(b)(2) provides "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  Fed. R. Crim. P. 12(b)(2).  A charge in a complaint may be dismissed if it is subject to a defense that may be decided solely on issues of law.  See United States v. Schafer, 625 F.3d 629, 636-37 (9th Cir. 2010), cert. denied, 131 S. Ct. 2919 (2011); United States v. Flores, 404 F.3d 320, 324

(5th Cir. 2005) (holding the propriety of granting a motion to dismiss an indictment by pretrial motion is "contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact."). Rule 12(b), Federal Rules of Criminal Procedure, may be utilized to challenge the Court's criminal jurisdiction over a specific defendant. <u>See</u> <u>United States v. Nukida</u>, 8 F.3d 665, 669 (9th Cir. 1993); <u>United States v. Marzook</u>, 426 F. Supp. 2d 820, 823-24 (N.D. Ill. 2006); <u>United States v. Bodmer</u>, 342 F. Supp. 2d 176, 180 (S.D.N.Y. 2004).

However, in some instances, subject matter jurisdiction turns on contested facts. In such a case, it is for the fact-finder to resolve the contested facts. Arguments raised in a motion to dismiss that rely on disputed facts should be denied. <u>United States v. Caputo</u>, 288 F. Supp. 2d 912, 916 (N.D. Ill. 2003), <u>citing</u> <u>United States v. Shriver</u>, 989 F.2d 898, 906 (7th Cir. 1992). In <u>United States v. Zepeda</u>, 705 F.3d 1052, 1056 (9th Cir. 2013), the Ninth Circuit indicated "...it is the special province of the jury to resolve any factual disputes arising under the two prongs of the <u>Bruce</u> test."[2]

---

[2] Because Defendant is charged with a Class B misdemeanor the matter would be tried to the Court as a bench trial and the Court would be the ultimate finder of fact. <u>See</u> <u>United States v. Stanfill El</u>, 714 F.3d 1150, 1154 (9th Cir. 2013). The parties have agreed that whether Defendant is or is not an "Indian" may be raised prior to trial and the evidence admitted in that determination is admitted for trial purposes. <u>See</u> Doc. 16. Therefore, whether the Court's jurisdiction is raised pretrial pursuant to Rule 12(b) or procedurally, the issue is raised as part of a bifurcated trial with the jurisdictional issue tried to the Court first and a Rule 29 standard applied, the end point of the journey is the same, "Is the defendant an Indian who is immune from federal prosecution?"
The Court notes that whether the jurisdictional issue is resolved pursuant to Rule 12(b) or as a question of fact at trial may impact

Native American tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian country.[3] Two federal statutes, however, provide for federal jurisdiction over some crimes committed in Indian country. As quoted supra, the General Crimes Act, 18 U.S.C. § 1152, grants federal jurisdiction over certain crimes committed by non-Indians against Indians in Indian Country, but excludes from federal jurisdiction crimes committed by one Indian against another. The Major Crimes Act, 18 U.S.C. § 1153, authorizes federal jurisdiction over criminal cases in which an Indian commits one of a list of enumerated crimes against another Indian in Indian country.[4]

---

upon the standard of review applicable on appeal. See United States v. Cruz, 554 F.3d 840, 843-46 (9th Cir. 2009). Therefore, the Court concludes the determination of Defendant's Indian status pursuant to Bruce is a question of fact for trial and the Court will make Rule 23(c) findings of fact. The question of the scope of immunity provided by 18 U.S.C. § 1152 is a question of law and will be decided pursuant to Rule 12(b).

[3]
[T]he term 'Indian country'...means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government...(b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof... and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
18 U.S.C. § 1151.

[4] The Major Crimes Act, in its entirety, provides:
(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse

-5-

Defendant contends he is an "Indian" and, therefore, that he may not be prosecuted in federal court pursuant to section 1152 for the pending Class B misdemeanor assault.

In a case brought by the government pursuant to 18 U.S.C. § 1152, the defendant has the burden of raising his Indian status as an affirmative defense and carrying the initial burden of production for that issue by a preponderance of the evidence. Once a defendant has met his burden of production, the burden shifts to the government to disprove the defense beyond a reasonable doubt. See United States v. Maggi, 598 F.3d 1073, 1081 n.3 (9th Cir. 2010)[5]; United States v. Cruz, 554 F.3d 840, 850 n.16 (9th Cir. 2009); Bruce, 394 F.3d at 1222-23. The test applied by the court to reach this determination is derived from United States v. Rogers, 45 U.S. (4 How.) 567, 11 L.Ed. 1105 (1846). In Rogers the Supreme Court interpreted a

---

or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

[5]

In contrast to § 1153(a), for prosecution under § 1152, the General Crimes Act, a defendant must not be an Indian if the victim is an Indian. While under § 1153(a) Indian status is an element of the crime that must be proved beyond a reasonable doubt, under § 1152 Indian status is treated as an affirmative defense for which the defendant has the burden of production.
United States v. Maggi, 598 F.3d 1073, 1081 n.3 (9th Cir. 2010).

predecessor of section 1152 and held that the defendant's adoption into an Indian tribe as an adult did not establish that he was an Indian for purposes of establishing federal criminal jurisdiction over a crime committed in Indian country. <u>See</u> 45 U.S. at 573-74. The Supreme Court held that the fact the defendant had been recognized as an Indian by a tribe was not sufficient to prove his Indian status; some evidence of Indian blood was also necessary. <u>Id.</u> at 573.

In other non-criminal areas of federal law, Congress has defined the term "Indian" differently than the term has been defined by the federal courts with regard to sections 1152 and 1153. <u>See</u> <u>United States v. LaBuff</u>, 658 F.3d 873, 877 (9th Cir. 2011), <u>cert.</u> <u>denied</u>, 132 S. Ct. 1855 (2012). To resolve the issue of who is an "Indian" for purposes of section 1152, in jurisdictions controlled by the precedent of the Ninth Circuit Court of Appeals, the District Courts apply the test stated in <u>Bruce</u>. <u>See</u>, <u>e.g.</u>, <u>Maggi</u>, 598 F.3d at 1082.[6] Pursuant to the Ninth Circuit's decision in <u>Bruce</u>, a defendant is an "Indian" for purposes of criminal prosecution by the federal government if he has: (1) Native American ancestry to a federally-recognized Indian tribe; and (2) tribal or federal government recognition as an Indian. <u>See</u> <u>Bruce</u>, 394 F.3d at 1223-24.

---

[6] The Ninth Circuit Court of Appeals applies a somewhat different test than the test applied by the Eighth Circuit Court of Appeals. <u>See</u> Daniel Donovan, John Rhodes, "Who is an Indian? History Creates a Legal Labyrinth and Defense Opportunities", *Champion*, 26 May 30, 34 n.87 (2012). <u>See also</u> <u>United States v. Diaz</u>, 679 F.3d 1183, 1187 (10th Cir. 2012); <u>United States v. Stymiest</u>, 581 F.3d 759, 764 (8th Cir. 2009).

**Findings of Fact**

Based upon the stipulations of the parties and the two days of evidentiary hearings, pursuant to Rule 23(c), the Court makes the following findings of material fact:

1. Defendant was born in 1981 and is 32 years of age. Defendant was born "off" the Fort Mojave Indian Reservation because there was no hospital on the reservation.

2. Defendant is, by blood quantum, 3/16 Fort Mojave Indian, all derived from his mother who is an enrolled member of the Fort Mojave Indian Tribe. Defendant's mother's blood quantum is 3/8 Fort Mojave Indian. Defendant's biological father is Hispanic. Defendant does not and has not had contact with his biological father.

3. Defendant has been denied enrollment as a member of the Fort Mojave Indian Tribe, a federally-recognized tribe. Defendant was denied membership because, pursuant to its Constitution, the tribe requires a 1/4 Fort Mojave blood quantum to be entitled to membership. Defendant was denied enrollment in the Fort Mojave Indian Tribe on or about February 11, 2006. According to his mother, Defendant was denied enrollment in the Fort Mojave Indian Tribe on two other occasions.

4. Defendant's mother, aunt, grandmother, and son are enrolled members of the Fort Mojave Indian Tribe.

5. Defendant was raised primarily by his mother and his aunt. His aunt, an enrolled member of the Fort Mojave Indian Tribe, lives on the Fort Mojave Indian Reservation. Defendant's mother resides near but off the reservation.

6. When Defendant was growing-up he lived a majority of

the time on the Fort Mojave Indian Reservation with his aunt, and he also lived for some time off the reservation with his mother.

7. The Fort Mojave Indian Health Center is operated by the Fort Mojave Indian Tribe pursuant to a "638 contract" with the federal government, pursuant to the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, codified at 25 U.S.C. §§ 450, et seq.

8. To be eligible for treatment at the Fort Mojave Indian Health Center, patients must provide either proof of enrollment in a federally-recognized Indian tribe or proof they are descended from a member of a federally-recognized Indian tribe.

9. Defendant is eligible to receive health care treatment from the Fort Mojave Indian Health Center, which has facilities in Needles, California, and Mohave Valley, Arizona. Defendant is eligible for these services because he is a descendant of an enrolled member of a federally-recognized Indian tribe.

10. Defendant received healthcare treatment at the Fort Mojave Indian Health Center in Mohave Valley, Arizona, on at least three occasions in 2008 and on February 24, 2012, and October 31, 2012.

11. Defendant has received services from the Fort Mojave Indian Tribe Behavioral Health Department on at least forty different occasions between July 2, 2007, and February 23, 2010.

12. There is no admissible evidence that Defendant ever

-9-

received medical service from a federal "Indian Health Services" ("IHS") facility, or that he received services which were paid for by IHS.   However, the Court notes that, as a descendant of a member of a federally-recognized Indian tribe, Defendant might be eligible to receive services from IHS.   See 25 U.S.C. § 1603(13).

13. Defendant attended grade school and most of high school at Arizona public schools that were located off the Fort Mojave Indian Reservation.  Defendant did briefly attended high school on the Fort Mojave Indian Reservation after a high school was established on the reservation.

14. Defendant received tutoring services through the Fort Mojave Indian Tribe while he was attending elementary and high school. He received those services through the Fort Mojave Indian Tribe because he is a descendant of an enrolled member of the tribe.  Defendant has not received these services since at least the age of 16.

15. As a juvenile, Defendant received breakfast and lunch through the Tribal Nutrition Program.

16. For approximately two years when he was nine to eleven years of age, during the summer, Defendant attended classes at the Fort Mojave Cultural Department.

17. As a juvenile, eighteen separate cause numbers were filed with regard to Defendant in Fort Mojave Tribal Court, including obstruction of police duties and underage consumption of alcohol.  As an adult, Defendant has received civil citations from the Tribal Police as a result of his actions on the reservation.

-10-

18. Defendant is not fluent in the Fort Mojave Indian language. He knows less than twenty words of the language and is self-taught.  His aunt and his mother are not fluent in the language, and very few Fort Mojave Indians speak the language.

19.  Defendant has tattoos over much of his body. With the exception of a tattoo of his grandmother, he obtained all of the tattoos while he was serving time in prison. The tattoos were designed by Defendant. One tattoo references the Arizona Village, which is on the Fort Mojave Indian Reservation. Defendant has some tattoos that are reminiscent of Native American culture in general and Defendant has one tattoo depicting Pamela Anderson and one depicting Christina Aguilera.

20.  While in prison Defendant participated in sitting in a sweat lodge, which is not a Fort Mojave Indian ritual. Defendant never engaged in this ritual on the Fort Mojave Indian Reservation.

21.  Defendant has played a traditional Fort Mojave Indian game called shinny (phonetic).  He does not and never has played the game regularly.  Because he is a descendant of a tribal member, Defendant can use tribal recreational facilities at no cost, including the use of a golf course and a boat launch located on the Colorado River.  Members of the public can also use these facilities but a fee is normally required.

22.  Defendant is currently unemployed.  Defendant previously worked for his step-father, who is Hispanic, in a landscaping business not affiliated with the Fort Mojave Indian Tribe.

23. The alleged victim in the charged assault is an

-11-

adult female Native American. She is an enrolled member of the Fort Mojave Indian Tribe and the mother of Defendant's son. The charged assault is alleged to have occurred at Defendant's aunt's house on the reservation.

24. Defendant's son is 15/32 Fort Mojave Indian. Defendant's mother has custody of Defendant's son and they do not live on the Fort Mojave Indian Reservation. Defendant does not contribute financially to the support of his son.

25. Defendant is currently in federal custody in Coconino County, where he is serving a seven-month sentence on a charge of assault on a federal law enforcement officer in violation of 18 U.S.C. § 111(a), which custody arises from his violation of supervised release in that matter. The matter was prosecuted before this Court.

26. Defendant's Arizona driver's license, issued in October 2012, indicates that he lives in Fort Mohave, Arizona, at his mother's address which is off the Fort Mojave Indian Reservation.

27. Defendant does not have his own residence on the Fort Mojave Indian Reservation.

28. From approximately 2002 through 2007, and 2009 through early 2012, Defendant was in state prison in California on felony assault convictions.

29. Defendant was recently sentenced to five days in jail for a State of Arizona misdemeanor charge of resisting arrest, which was prosecuted in the Bullhead City, Arizona, Justice Court. Defendant pled guilty to this charge on or about February 7, 2013. The crime occurred on the Fort Mojave Indian

Reservation at the home of Defendant's aunt.

30.   On or about November 5, 2012, at an arraignment for criminal charges in the Fort Mojave Tribal Court, the Tribal Court dismissed the charges against Defendant. The Tribal Court did not recognize criminal jurisdiction over Defendant, because defendant is not an enrolled member of the Fort Mojave Tribe. The tribal prosecutor was granted leave to file a civil complaint against Defendant.   The incident that occurred on November 5, 2012, involved the same victim as in the instant case.

31. The Fort Mojave Tribal Police do not have authority to charge non-Indians with criminal violations under the Fort Mojave Tribal Code.

32.   Unlike an enrolled tribal member, Defendant is not eligible to seek election for tribal office nor is he eligible to vote in tribal elections.   Additionally, unlike an enrolled tribal member, the tribe may remove and exclude Defendant from the Fort Mojave Indian Reservation.

33. There is nothing in the record before the Court to indicate the Bureau of Indian Affairs considers Defendant to be an Indian.

34. Defendant has attended funeral services for Fort Mojave tribal members and in doing so participated in traditional ceremonies for the deceased.   These services are generally open to anyone, however, the Court heard testimony that these services are primarily attended by family members, friends, and those residing in the Fort Mojave community (some who are not Native American). Defendant has worn traditional

Mojave Indian clothing at the funerals.

35. The Fort Mojave Tribal Police referred the instant criminal case to the United States Attorney's Office for the District of Arizona (Flagstaff Division) because the Fort Mojave Tribal Court has ruled it does not have criminal jurisdiction over Defendant pursuant to the Fort Mojave Tribal Code.

**Analysis**

First, the Court concludes Defendant has met his burden of proof by a preponderance of the evidence that Defendant is an "Indian". Accordingly, the burden has shifted to the government to prove beyond a reasonable doubt that Defendant is not an "Indian."

The Fort Mojave Indian Tribe is a federally-recognized tribe. Defendant is 3/16th, or one and one-half eighths, Fort Mojave Indian by blood quantum. Defendant does not assert that, in addition to Fort Mojave, he has other Native American ancestry. The Ninth Circuit has previously held a one-eighth blood quantum to be adequate to establish Native American ancestry. See LaBuff, 658 F.3d at 874-75; Maggi, 598 F.3d at 1080. Accordingly, Defendant has, barely, satisfied the first prong of the Bruce test.

With regard to the elements of the second prong of the Bruce test:

> In assessing the second prong, Bruce outlined four factors that a court should consider to determine whether an individual has tribal or federal government recognition as an Indian: (1) tribal enrollment; (2) government recognition formally and informally through receipt of assistance reserved only to Indians; (3) enjoyment of the benefits of tribal affiliation; and (4) social

-14-

recognition as an Indian through residence on a reservation and participation in Indian social life. [] <u>Bruce</u> lists these factors in declining order of importance, <u>United States v. Cruz</u>, 554 F.3d 840, 851 n.17 (9th Cir. 2009) (citing <u>Bruce</u>, 394 F.3d at 1224), and we acknowledge that these factors, "while broad, should not be deemed exclusive." <u>Maggi</u>, 598 F.3d at 1081.

<u>United States v. Juvenile Male</u>, 666 F.3d 1212, 1214-15 (9th Cir. 2012) (some internal citations omitted).

Defendant is not an enrolled member of a federally recognized Indian tribe, his request for admission having been rejected by the Fort Mojave Indian Tribe on several occasions. The Tribe's plenary ability to reject Defendant's application for tribal membership is one of the "full attributes of sovereignty" possessed by the Tribe, repeatedly emphasized by the federal courts and, accordingly, a decision not subject to review by any federal court. <u>See</u>, <u>e.g.</u>, <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 55, 98 S. Ct. 1670, 1675 (1978); <u>Lewis v. Norton</u>, 424 F.3d 959, 961 (9th Cir. 2005). Although the most important element of this portion of the test, this determination is not dispositive of the issue. <u>See</u>, <u>e.g.</u>, <u>United States v. Antelope</u>, 430 U.S. 641, 647 n.7, 97 S. Ct. 1395, 1399 n.7 (1977)("[E]nrollment in an official tribe has not been held to be an absolute requirement for federal jurisdiction, at least where the Indian defendant lived on the reservation and maintained tribal relations with the Indians thereon." (internal quotation omitted)); <u>United States v. Broncheau</u>, 597 F.2d 1260, 1263 (9th Cir. 1979) ("Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative.").

-15-

1        The second factor of the second prong of <u>Bruce</u>
2   evaluates "government recognition formally and informally
3   through receipt of assistance reserved only to Indians."
4   Defendant presented evidence he received government assistance
5   provided to the <u>descendants</u> of Indians.   Defendant has not
6   established that he received benefits from the federal
7   government reserved only to Indians.[7]

8        With regard to the third factor, which is relevant to
9   Defendant's "political affiliation" to the tribe, Defendant
10  produced evidence that he received benefits reserved to
11  descendants of members of the Fort Mojave Indian Tribe.   <u>See</u>
12  <u>LaBuff</u>, 658 F.3d at 878; <u>Means</u>, 432 F.3D at 930.   Although
13  descendant status carries some weight, it is not as important as
14  actual enrollment in the tribe.   <u>See</u> <u>Maggi</u>, 598 F.3d at 1082.
15  Additionally, from the tribe's perspective, such descendant
16  benefits are benefits provided to the tribal member, in this
17  case Defendant's mother, and not evidence of Defendant's
18  political affinity with the tribe.   Without such descendant
19  benefits Defendant's mother would have been required to seek
20  assistance off the reservation.

21       The fourth factor requires Defendant to make a showing
22  of "social recognition as an Indian through residence on a
23  reservation and participation in Indian social life."   <u>Bruce</u>,
24  394 F.3d at 1224.   The Court notes that this is a factor in
25  determining "tribal or federal government recognition as an

26  ─────────────────────

27      [7] To the Court this factor appears to be circular reasoning.   The Court
     must evaluate Defendant's "Indian" status by looking to benefits only
28   reserved to "Indians."   What definition is the Court to look to in
     determining what benefits are reserved solely for "Indians"?

Indian", which seems to infer that "social recognition as an Indian" must come from the tribe or members of the tribe. However, precedent established by the Ninth Circuit requires the Court's analysis must be from the "perspective of both the tribe *and the individuals*." <u>Cruz</u>, 554 F.3d at 850 (emphasis added).

        This test evaluates whether the defendant was raised and attended school on a reservation, and whether they participated in tribal activities, such as voting in tribal elections. While participating in tribal activities is important for purposes of evaluating this factor, the Ninth Circuit has held that the lack of such activities does not preclude a reasonable inference of social recognition when the defendant has lived his "entire life" on the reservation. <u>LaBuff</u>, 658 F.3d at 878-79.[8]

        Unlike the defendant in <u>LaBuff</u>, Defendant did not receive free healthcare available only to <u>Indians</u>, i.e., services provided by IHS. Unlike the defendant in <u>LaBuff</u>, Defendant has not lived on the reservation his entire life, nor has Defendant been convicted in Indian tribal court for crimes, as compared to civil juvenile proceedings; to the contrary,

---

[8]
    In <u>LaBuff</u>, we held that the defendant was an Indian even though he was not an enrolled member of the tribe, and "the evidence relating to the fourth factor was not particularly strong." 658 F.3d at 877, 879. LaBuff did not participate in tribal activities, nor did he vote in tribal elections. <u>Id.</u> at 879. Even so, because LaBuff had Indian descendant status, received free healthcare available only to Indians, lived on the reservation his entire life, and, without objection, was prosecuted in Indian tribal court for previous crimes, we held that the government had established his Indian status. <u>United States v. Juvenile Male</u>, 666 F.3d 1212, 1215 (9th Cir. 2012).

-17-

Defendant has been prosecuted for crimes by the local justice court, by the federal court, and by at least one state court.[9]

In addition to the specific factors listed in Bruce, when determining if Defendant is an "Indian" for purposes of section 1152, as noted previously, the Court may also consider evidence relating to whether Defendant was prosecuted and convicted under the jurisdiction of the Fort Mojave or other tribal courts. See LaBuff, 658 F.3d at 879; Cruz, 554 F.3d at 850-51. The assumption and exercise of tribal jurisdiction over criminal charges demonstrates tribal recognition of the defendant as an Indian. See Bruce, 394 F.3d at 1227. In this matter, the Fort Mojave Indian Tribe has not assumed tribal criminal jurisdiction over Defendant, indeed it has steadfastly refused to do so.

Although Defendant's lack of participation in certain tribal member activities does not preclude the inference of social recognition, his lack of participation in Fort Mojave tribal activities is in addition to the fact that Defendant has not lived his "entire life" on the Fort Mojave Indian Reservation. By virtue of his own actions, i.e., commission of

---

[9] During the evidentiary hearing Defendant urged the Court to give great weight to the numerous proceedings where, as a youth, he appeared before the Fort Mojave Juvenile Court. The Court noted that, while the portion of the Tribal Code produced for the Court's review mentioned the establishment of the Juvenile Court, the statutory authority as to how the Juvenile Court actually operated was not part of the record. A request was made for the pertinent portions of the Tribal Code to be provided by the parties to the Court. To date those portions of the Tribal Code have not been produced. The Court concludes, from the Tribal Police Officer's testimony, that the proceedings were civil in nature and the Court presumes they were conducted in a manner similar to that found in 18 U.S.C. § 5031 et seq. and the Bureau of Indian Affairs regulations for Indian Courts. See 25 C.F.R. §11.901.

criminal acts, Defendant has caused his removal from and prevented his return to the reservation for most of his adult life.

Neither has Defendant participated, to any substantial degree, in exclusively <u>tribal</u>, as compared to generic "Native American", activities, which would reflect an "affiliation" with a federally-recognized tribe. Attending funerals is not a uniquely tribal activity; the funerals are attended by tribal members and non-Indians. Participating in a sweat lodge ceremony while incarcerated, a ritual not considered to be part of Fort Mojave Indian religion or culture, is not a <u>tribal</u> activity.

Accordingly, the Court concludes that Defendant does not meet the first, and most important element of the second half of the <u>Bruce</u> test, i.e., Defendant is not an enrolled member of a federally-recognized Indian tribe. With regard to the second and third elements, Defendant has received some benefits reserved to the descendants of Indians, although not those reserved to Indians, and Defendant has enjoyed some benefits of tribal affiliation.

With regard to the fourth element of the second prong of the <u>Bruce</u> test, although a close issue, the Court concludes Defendant has not established sufficient, current, "social recognition as an Indian through residence on a reservation and participation in Indian social life." The evidence in this matter indicates that Defendant has never maintained his own residence on the reservation and, unlike a tribal member, Defendant can be removed and excluded from the Fort Mojave

-19-

Indian Reservation. Defendant is ineligible to run for tribal office and he may not vote in tribal elections. Most importantly, the only tribe with which Defendant claims affiliation has repeatedly refused to recognize him as a member. The Fort Mojave Tribal Court has decided that it does not have criminal jurisdiction over Defendant due to his status as a non-member.

Accordingly, after balancing all the factors in the Bruce test, the Court concludes the government has met its burden of proof and shown beyond a reasonable doubt that Defendant is a non-"Indian". Therefore, the Court has jurisdiction over Defendant, a non-Indian, pursuant to 18 U.S.C. § 1152.[10]

**The "Jurisdictional Void"**

The government argues Defendant's status as a non-Indian has already been decided by the Fort Mojave Indian Tribe,

---

[10] The Court is bound to follow Ninth Circuit precedent and apply the test stated in Bruce to this case to decide the pending motion. However, this case demonstrates the flaws in applying an extremely fact-bound and subjective test to determine the Court's jurisdiction when a defendant, although of Indian ancestry, is not an enrolled member of a federally recognized Indian tribe. The Court notes that application of the case-by-case analysis in this matter required two days of hearings and substantial briefing to determine the Indian status of one defendant. The Court can empathize with any tribal court which may not wish to engage in a similar process. Additionally, it seems incongruent with the concept of subject matter jurisdiction and adequate notice being provided to the public that a person's status as an "Indian" is so subjective and changeable over time. The Ninth Circuit's treatment of this issue has not always been consistent. In Maggi the Ninth Circuit indicated the social connections to the tribe must be "current." 598 F.3d at 1081. Yet in other decisions such as LaBuff the court looked to historical contact. See 658 F.3d at 878-79. In most other matters a person is an "Indian" if a federally-recognized tribe has enrolled them as a member.

i.e., the only tribe with which Defendant asserts an affiliation has decided Defendant is not an "Indian". The government also argues that, by virtue of the doctrine of comity, the Fort Mojave Tribal Court's decision should be controlling in this Court. The government's argument assumes the Fort Mojave Tribal Court concluded Defendant is a non-Indian. A review of the Tribal Court's Order dated November 5, 2012, reveals:

> THE DEFENDANT IS PRESENT IN CUSTODY FOR ARRAIGNMENT, THIS COURT IS ADVISED BY PROSECUTION THAT THE DEFENDANT AFTER REVIEW OF THIS TRIBES RECORDS FOR MEMBERSHIP, IS NOT A TRIBAL PERSON. TRIBES MOTION TO DISMISS WITHOUT PREJUDICE AND MAY REFILE AS A CIVIL COMPLAINT. ORDER BY THE COURTS. THE DEFENDANT IS RELEASED. TRIBES MOTION IS GRANTED. DISMISSED WITHOUT PREJUDICE.

Doc. 28 (evidentiary hearing conduct May 8, 2013), Def's Exh. 4.

According to the record, the Tribal Court merely determined Defendant was not a tribal member and on that basis would not assume criminal jurisdiction. The Tribal Court did not determine Defendant's "Indian" status. Whether additional considerations entered into the Tribal Court's decision not to assume jurisdiction over Defendant, such as due to the costs of prosecution and incarceration, are not known.

The government further notes the "jurisdictional void" over Defendant's criminal acts if the Court finds he is an "Indian" pursuant to section 1152.

> The Fort Mojave Tribal Court has previously determined it does not have jurisdiction over the defendant, and this Court should respect the Tribal Court's recent determination in that regard. (See Doc. 16 ¶¶ 14, 15.) *If this Court rules to the contrary, we could be faced with a situation where both the Tribe and the United States would ostensibly lack subject matter jurisdiction to charge the*

1       *defendant with certain misdemeanor criminal*
      *violations that occur on the Fort Mojave*
2       *Indian Reservation*. As a result, no entity
      may claim jurisdiction for certain crimes
3       over the defendant....

4 Doc. 19 at 1 (emphasis added).

5       As argued by the government, the Court is also mindful

6 of the fact that there is, arguably, a risk that no government

7 entity (i.e., federal, state, or tribal) would prosecute

8 Defendant for certain criminal violations occurring on the Fort

9 Mojave Indian Reservation were the Court to conclude he is an

10 "Indian".

11       Simply put:

12     The Supreme Court and the Ninth Circuit
    accurately observed: "The exercise of
13     criminal jurisdiction over Indians and Indian
    country is a 'complex patchwork of federal,
14     state, and tribal law, which is better
    explained by history than by logic."'   The
15     Major Crimes Act, 18 U.S.C. § 1153,
    establishes federal criminal jurisdiction
16     over specified serious crimes committed in
    Indian country by Indian defendants.   The
17     crimes include murder, manslaughter,
    kidnapping, maiming, felony sexual assault,
18     incest, assault with intent to commit murder,
    assault with a dangerous weapon, assault
19     resulting in serious bodily injury, assault
    against an individual who has not attained
20     the age of 16 years, felony child abuse or
    neglect, arson, burglary, robbery, and felony
21     theft.
    The General Crimes Act, 18 U.S.C. § 1152,
22     provides federal criminal jurisdiction over
    federal enclave crimes committed in Indian
23     country and requires an Indian defendant or
    Indian victim. "Thus, under the Indian
24     General Crimes Act, the criminal laws of the
    United States apply to offenses committed in
25     Indian country by non-Indians against Indians
    and by Indians against non-Indians." As by the
26     Tenth Circuit summarized, the General Crimes
    Act "establishes federal jurisdiction over
27     interracial crimes only."
    Neither statute defines "Indian." If
28     neither the defendant nor the victim is an

Indian, even where the crime occurs in Indian country, there is no federal jurisdiction.

Daniel Donovan, John Rhodes, "Who is an Indian? History Creates a Legal Labyrinth and Defense Opportunities", *Champion*, 26 May 30, 30 (2012). Although phrased in slightly different terms, the court in <u>Bruce</u> recognized a similar problem. <u>See</u> 394 F.3d at 1230.

This case presents a unique factual and jurisdictional conundrum apparently of first impression. Notwithstanding the 1990 amendments to the Indian Civil Rights Act, codified at 25 U.S.C. § 1301 et seq., the Fort Mojave Indian Tribe has declined to prosecute a defendant who <u>may</u> be an "Indian" and the Tribe's decision is apparently based solely on the defendant's lack of tribal membership, i.e., the Tribal Court has determined it does not have jurisdiction under its laws.

A resolution of this issue and the scope of immunity provided by 18 U.S.C. § 1152 requires a brief divergence into history and certain principals of Indian law. The Mojave people traditionally lived along the Colorado River from present day Yuma, Arizona, to the Parker area. In 1865 the Colorado River Indian Reservation was created, forcing many of the Chemehuevi, Navajo, Hopi, and Mojave, each distinct and separate cultures residing along the Colorado River, to reside together upon the newly-created reservation.

From 1890 through 1911 the Fort Mojave Indian Reservation was established and at times modified, creating a new reservation for the Mojave Tribe near Needles, California, and spread over lands located in Arizona, California, and

1  Nevada.   See Fort Mojave Indian Tribe v. United States, 23 Cl.

2  Ct. 417, 420 n.1 (1991).  The Fort Mojave Indian Tribe was

3  formally organized under the Indian Reorganization Act of 1934

4  and established a system of self-governance by way of a

5  constitution and business charter which cannot be revoked or

6  surrendered except by an act of Congress.  See Fort Mojave Tribe

7  v. County of San Bernardino, 543 F.2d 1253, 1255 (9th Cir.

8  1976). In Article II of their Constitution the Ft. Mojave Indian

9  Tribe established who may become a member of the tribe.   See

10 Doc. 16, Exh. A.   The tribe also established a Law and Order

11 Code. Id., Exh. B.  Section 102 of the Code indicates the Tribal

12 Court shall have subject matter jurisdiction of all civil causes

13 of action and criminal jurisdiction of all violations of the

14 Code or tribal ordinances, subject to any limitations,

15 restrictions or exceptions imposed by the "Constitution or laws

16 of the United States."

17       It has been federal policy that the American Indian has

18 a special status in the United States and is entitled to special

19 protection.

20          The relationship between the federal
           government and the American Indian is like
21         that between a guardian and his ward, thereby
           placing the Indian in a peculiar and
22         protected status. We view the enactment of
           the Indian Civil Rights Act as evidence of
23         this continuing congressional solicitude for
           the welfare of the American Indian.
24

25 Red Fox v. Red Fox, 564 F.2d 361, 365 (9th Cir. 1977) (internal

26 citation omitted).

27       But Congress' policy toward Indians has varied greatly

28 over time.

-24-

1
2
3
4
5
6

> Congressional policy, for example, initially favored "Indian removal," then "assimilation" and the breakup of tribal lands, then protection of the tribal land base (interrupted by a movement toward greater state involvement and "termination" of recognized tribes); and it now seeks greater tribal autonomy within the framework of a "government-to-government relationship" with federal agencies.

7

<u>Lara</u>, 541 U.S. at 202, 124 S. Ct. at 1634.

8
9
10
11
12
13
14
15
16
17
18
19
20
21

In 1871 Congress ended the practice of entering into new treaties with American Indian tribes but preserved those treaties then in existence. <u>See</u> <u>id.</u>, 541 U.S. at 201, 124 S. Ct. at 1634. While Congress has the power to abrogate or modify treaty rights, it may do so only if it indicates clearly that is what it is doing. <u>See</u> <u>Menominee Tribe of Indians v. United States</u>, 391 U.S. 404, 405, 88 S. Ct. 1705, 1707 (1968). Judicially made "Indian law" draws primarily upon the treaties executed by the Executive Branch of the federal government and legislation passed by Congress. <u>Lara</u>, 541 U.S. at 206, 124 S. Ct. at 1636-37. As noted supra, "Federal Indian policy is, to say the least, schizophrenic. And this confusion continues to infuse federal Indian law ..." <u>Id.</u>, 541 U.S. at 219, 124 S. Ct. at 1644 (Thomas, J., concurring).

22
23
24
25
26
27
28

The Supreme Court has recognized that over time the sophistication of and resources available to tribal courts can vary dramatically but the Constitution does not dictate the "metes and bounds" of tribal autonomy. <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191, 197, 205, 210-12, 98 S. Ct. 1011, 1019, 1021-22 (1978), <u>superseded</u> <u>by</u> <u>statute</u>, <u>see</u> <u>Lara</u>, 541 U.S. at 207, 124 S. Ct. at 1637. Similarly, as most recently

addressed in Title IX of the "Violence Against Women Reauthorization Act of 2013", Congress recognizes the numerous difficulties tribal courts encounter financially and otherwise in addressing crime in Indian country. <u>See</u> Pub. L. No. 113-4, 127 Stat. 54 (Mar. 7, 2013).

It is against this confusing and sometimes contradictory area of the law that the scope of the immunity granted by section 1152 must be measured.

In the seminal case of <u>Duro v. Reina</u>, a non-member Indian challenged the Salt River Indian tribe's assertion of jurisdiction over a crime committed on the Salt River Indian Reservation. <u>See</u> 495 U.S. 676, 689-92, 110 S. Ct. 2053, 2062-63 (1990). The Supreme Court reversed the Ninth Circuit Court of Appeals' conclusion that the tribal court could exercise jurisdiction over a non-member Indian (an enrolled member of a California tribe) alleged to have murdered a 14-year-old non-member Indian (a member of the Gila River tribe), on the Salt River Indian Reservation. The Supreme Court held that, as a matter of federal common law, Indian tribes had no historic inherent authority to criminally prosecute non-member Indians in tribal court.

While addressing a "jurisdictional void" argument, the Supreme Court in <u>Duro</u> pondered without deciding whether section 1152 only applied to Indians of tribal membership:

> *Our decision today does not imply endorsement of the theory of a jurisdictional void presented by respondents and the court below. States may, with the consent of the tribes, assist in maintaining order on the reservation by punishing minor crime.* Congress has provided a mechanism by which

-26-

> the States now without jurisdiction in Indian country may assume criminal jurisdiction through Pub. L. 280, see n.1, supra. Our decision here also does not address the ability of neighboring tribal governments that share law enforcement concerns to enter into reciprocal agreements giving each jurisdiction over the other's members. *As to federal jurisdiction under § 1152, both academic commentators and the dissenting judge below have suggested that the statute could be construed to cover the conduct here.* See 851 F.2d, at 1150–1151.
> *If the present jurisdictional scheme proves insufficient to meet the practical needs of reservation law enforcement, then the proper body to address the problem is Congress, which has the ultimate authority over Indian affairs.* We cannot, however, accept these arguments of policy as a basis for finding tribal jurisdiction that is inconsistent with precedent, history, and the equal treatment of Native American citizens.

495 U.S. at 696-98 & n.3, 110 S. Ct. at 2065-66 & n.3 (emphasis added).

Several months after the Supreme Court's <u>Duro</u> decision was issued and in direct response to the opinion, Congress amended the Indian Civil Rights Act, but not section 1152 of the federal criminal code. The amendments explicitly granted the tribes the <u>permissive</u> authority to prosecute non-member Indians in tribal court. The Congressional amendment is often referred to as the "Duro fix." In amending ICRA Congress explicated that, contrary to the Supreme Court's holding in <u>Duro</u>, the tribes had always possessed the authority to prosecute non-member Indians, under the federal common law doctrine of "inherent" sovereignty. See 25 U.S.C. § 1301(1)(2). See <u>also</u> <u>United States v. Enas</u>, 255 F.3d 662 (9th Cir. 2001) (en banc) (concluding that, because <u>Duro</u> was an expression of federal common law, Congress could legitimately "overrule" the holding

1    of _Duro_ through the exercise of legislative power).

2              In his dissent from the Ninth Circuit Court of Appeals'

3    majority opinion in _Duro_, which majority opinion was overruled

4    by the Supreme Court, Judge Sneed opined:

5              I acknowledge that the exclusion of nonmember
               Indians from the jurisdiction of tribal
6              courts will impose somewhat greater
               responsibilities on certain United States
7              Attorneys. Nonmember offenses not directed at
               another Indian, and not described in the
8              Major Crimes Act, [18] U.S.C. § 1153, must be
               prosecuted by these officials. This category
9              embraces such things as drunk and disorderly
               conduct.
10             ***
               _The majority also suggests that state_
11             _prosecutors and state courts may become_
               _involved in law enforcement. This concern_
12             _appears to be premised on the assumption that_
               _an offense by a nonmember Indian against_
13             _another Indian, which is not a major crime,_
               _would not be covered by 18 U.S.C. § 1152 were_
14             _my view to prevail. Thus, the majority_
               _suggests state law enforcement would be_
15             _required to fill the gap._
               ***
16             The fear of the majority can be put this way.
               As they see it, an offense which is not a
17             major one by an Indian against an Indian is
               excluded from federal jurisdiction when
18             tribal jurisdiction is lacking because the
               offender is a nonmember. I suggest that under
19             those circumstances the offense "escapes" the
               first exception to the general rule of [18]
20             U.S.C. § 1152 but does not "escape" the broad
               reach of 18 U.S.C. § 1152. That is, the
21             offense remains an offense by an Indian
               within Indian country and thus subject to the
22             general laws of the United States, but, for
               the reason stated here, should not be
23             considered as one committed by one Indian
               against another within the meaning of the
24             first exception to 18 U.S.C. § 1152. _Put more_
               _simply, the nonmember Indian should be_
25             _treated as a non-Indian._

26   _Duro v. Reina_, 851 F.2d 1136, 1150-51 (9th Cir. 1987) (emphasis

27   added), _rev'd by_ _Duro v. Reina_, 495 U.S. 676, 689-92, 110 S. Ct.

28   2053, 2062-63 (1990).  _See_ _also_ _Duro v. Reina_, 860 F.2d 1463,

1469-70 (9th Cir. 1988) (order denying en banc review, Kozinski, J., Leavy, J., and Trott, J., concurring in Judge Sneed's dissent).

Since <u>Duro</u>, the Ninth Circuit Court of Appeals has affirmed that a recognized Indian tribe may prosecute and punish an enrolled member of another tribe for crimes against a tribal member. <u>See</u>, <u>e.g.</u>, <u>Means</u>, 432 F.3d at 934-35. However, commentators have noted the continued potential for a "jurisdictional void," where tribes do not have jurisdiction to prosecute a non-member "Indian" for a misdemeanor crime and the federal government does not have jurisdiction to try the defendant because they are found to be an "Indian" for purposes of section 1152, notwithstanding the fact that no tribe acknowledges their Indian status. <u>See</u> Gideon M. Hart, "A Crisis in Indian Country: An Analysis of the Tribal Law and Order Act of 2010," 23 Regent U. L. Rev. 139, 139, 139 (2010-2011); Daniel Donovan, John Rhodes, "Who is an Indian? History Creates a Legal Labyrinth and Defense Opportunities", *Champion*, 26 May 30 (2012).

Bolstering the statutory and common-law sources of federal jurisdiction over some crimes in Indian Country, the federal courts have noted that, through its treaties with various federally-recognized tribes, the United States has assumed an obligation to remove "bad men" from the reservations.[11]   <u>See</u> <u>Means</u>, 432 F.3d at 935-36; <u>Tsosie v. United</u>

---

[11] From 1867 to 1868 the federal government entered into nine such treaties with thirteen tribes. <u>See</u> Lillian Marquez, "Making 'Bad Men' Pay: Recovering Pain and Suffering Damages for Torts on Indian Reservations Under the Bad Men Clause," 20 Fed. Circuit B.J. 609, 612-13

<u>States</u>, 825 F.2d 393 (Fed. Cir. 1987).  The 1868 treaty between the Navajo Nation and the United States is typical and, at Article I, provides:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States...

Treaty between the United States of America and the Navajo Tribe of Indians, June 1, 1868, U.S.-Navajo, 15 Stat. 667.  While the historical record regarding the treaties is sparse it is reported that the "bad men" clauses were included in the treaties so that, if the tribes lived in peace with their neighbors, the federal government would stand between the tribal members and "other Indians and Mexicans" to ensure the peace. See <u>Tsosie</u>, 825 F.2d at 400 n.2.

In <u>Means</u>, the Ninth Circuit stated:

> A common sense understanding of the treaty language would be that the United States was obligating itself to protect the Navajos from "bad men," of whom the world is never short, and the Navajos were obligating themselves to turn the "bad men" over to the United States when appropriate under the specified conditions. *The treaty obligates the United States to arrest and punish offenders against the Navajo, under federal law, but it does not say that the Navajo cannot do so on their own*, and there is nothing in the treaty language inconsistent with the concurrent jurisdiction that we have recognized in other contexts.
> The remedies provided for by the 1868

(2011).

1
2
3
4
5
6
7
8

>treaty do not purport to be exclusive. Under
>the treaty, Indian offenders are to be
>delivered to the United States for
>prosecution under federal law on request.
>This provision, however, is conditioned on a
>request from the United States's agent. The
>treaty conditions have not been fulfilled in
>this case, so the rendition provision in the
>treaty does not apply. The United States has
>not demanded that the Navajo turn Means over
>for federal prosecution, and the Navajo have
>chosen to prosecute Means themselves in
>tribal court, which the 1990 Amendments to
>the Indian Civil Rights Act recognize they
>have the power to do.

9
10

432 F.3d at 936-37 (emphasis added).

11
12
13
14
15
16
17
18
19
20

    As a practical matter, in light of the Indians' protected status under federal law, the government's treaty obligations, and as a matter of comity to the tribal courts, and as a rational interpretation of the accepted precepts governing tribal sovereignty over tribal members and crimes committed against tribal members on Indian reservations by those acknowledged to be of Indian ancestry, the Court concludes that in using the term "Indian" in section 1152 Congress intended it to mean an Indian who is an enrolled member of a federally-recognized tribe.

21
22
23
24
25

>"Indian law" draws principally upon the
>treaties drawn and executed by the Executive
>Branch and legislation passed by Congress.
>These instruments, which beyond their actual
>text form the backdrop for the intricate web
>of judicially made Indian law, cannot be
>interpreted in isolation but must be read in
>light of the common notions of the day and
>the assumptions of those who drafted them.

26

Oliphant, 435 U.S. at 206, 98 S. Ct. at 1019-20.

27
28

    Since its first enactment in 1817 (3 Stat. 383), additions added in 1854 (10 Stat. 270), sequent codification in

18 U.S.C. § 1152, and the enactment and amendment of the Indian Civil Rights Act, the language of section 1152 has never been amended, yet the government has entered into nine separate treaties with thirteen separate and distinct tribes obligating the federal government to remove all "bad men" from those tribes' lands and prosecute them in federal courts when requested by the Tribe, exactly what occurred in this matter. In order to give validity to those treaties, as the Court is obligated to do, and which Congress has not repealed, and even though the treaties are with tribes other than the Fort Mojave Indian Tribe, the use of the term "Indian" in section 1152 must, as Judge Sneed concluded, mean an Indian who is a tribal member. As such, should this Court have concluded Defendant was an "Indian" section 1152 would not grant him immunity from federal prosecution as he is not a tribal member.

Accordingly,

**IT IS ORDERED that** Defendant's motion to dismiss is **denied**, and the matter will be set for continuation of the trial.

DATED this 1st day of July, 2013.

_____
Mark E. Aspey
United States Magistrate Judge

-32-